## Appeal of G. M. STANDIFER CONSTRUCTION CORPORATION and VANCOUVER HOME CO.

Docket No. 5550.   Decided July 30, 1926.

1. A corporation took over the business and assets of another corporation which had taken over the business and assets of successive partnerships, the first of which was engaged in the general contracting and construction business on August 1, 1914, but did not at that time build ships. *Held*, that the taxpayer corporation, which was organized in 1917, was the successor of a business which was in existence on August 1, 1914, and as such does not come within the proviso of section 240(a) of the Revenue Act of 1918.

2. A claim for amortization filed within the statutory period by the principal or parent corporation in a consolidated group, when the deduction is claimed on account of facilities acquired by an affiliated corporation, is a sufficient compliance with the statute with respect to the filing of an amortization claim.

3. Buildings erected by an affiliated corporation for the use of employees of a corporation engaged in building ships are facilities acquired for production of articles contributing to the prosecution of the war within the meaning of section 234 of the Revenue Acts of 1918 and 1921.

4. In a consolidated return, the amortization deduction is allowable to the consolidated group.

5. The deduction on account of the amortization of war facilities should be spread over the taxable years or periods within the amortization period in accordance with the net income of the consolidated group during those respective periods, before any amortization is deducted.

6. In computing the war-profits tax for 1920, the consolidated group is entitled to deduct from its income derived from war contracts the amortization deduction to which it is entitled during that year.

7. The amount received from the Fleet Corporation as a lump sum settlement of all claims of the taxpayer was not reimbursement to the taxpayer of the cost, or any part thereof, of war facilities and should not be applied to reduce the basis on which the amortization deduction is determined.

8. *Held*, under the facts of this case, that the taxpayer is entitled to have its profits tax assessed under the provisions of section 328 of the Revenue Acts of 1918 and 1921 for the respective years involved in this appeal.

*Laurence Graves, Esq., Charles E. McCulloch, Esq.,* and *Wayne Johnson, Esq.,* for the petitioners.

*Preston C. Alexander, Esq.,* and *John D. Foley, Esq.,* for the Commissioner.

*Ralph S. Rounds, Esq., H. Maurice Darling, Esq., Arthur A. Ballantine, Esq., Thomas M. Taylor, Esq., James J. Cosgrove, Esq.,* and *S. Milton Simpson, Esq.,* as *amici curiæ.*

Before GRAUPNER [1], TRAMMELL, and PHILLIPS.

This is an appeal from the determination by the Commissioner of deficiencies for the years 1919 to 1922, inclusive, in the following amounts:

$46, 516 .55
548, 102. 86
76, 167. 90
6, 118. 45

Total_____676, 905. 76

The principal issues involved are: (1) The amortization deduction allowable to the taxpayer; (2) whether the two corporations involved were affiliated; and (3) whether the G. M. Standifer Construction Corporation is entitled to have its taxes assessed under section 328 of the Revenue Acts of 1918 and 1921.

FINDINGS OF FACT.

1. The G. M. Standifer Construction Corporation (for convenience hereinafter referred to as the Standifer Corporation), is an Oregon corporation organized May 3, 1917, with an authorized capital stock of $900,000. The Vancouver Home Co. (hereinafter referred to as the Home Company), was incorporated under the laws of the State of Washington on June 6, 1918, with an authorized capital stock of $20,000. Both corporations have their principal offices at Vancouver, Wash. The capital stock of the Standifer Corporation was, on June 1, 1917, reduced from $900,000 to $300,000.

2. Prior to 1913, there existed a partnership known as Flagg and Standifer. In 1913 the partnership business, including assets and liabilities, was taken over by a partnership known as Standifer-Clarkson Co. This company was, in the summer of 1916, incorporated under the same name. In November, 1916, the business, assets and liabilities of the Standifer-Clarkson Co. were taken over by the Standifer-Clarkson Shipyards, Inc., which was incorporated in November, 1916.

The Standifer-Clarkson Shipyards, Inc., was an Oregon corporation which, among other assets, owned a one-way wood shipyard, which it operated at North Portland, Oreg. In May, 1917, it sold, assigned, transferred and conveyed to the Standifer Corporation all of its business and assets, real, personal and mixed, including a certain lease covering its shipyard site, as well as all shipways, buildings, structures, machinery, tools, appliances, etc., and the Standifer Corporation assumed the liabilities of such corporation. The busi-

---

[1] This decision was prepared during Mr. Graupner's term of office.

ness was thereafter carried on without interruption by the Standifer Corporation.

G. M. Standifer owned the principal interest in the business of the above named Flagg and Standifer and that of the successor partnerships and corporations, all of which organizations were engaged in the business of contractors and general construction work. They built railroads, office buildings, bridges and other kinds of structures. Contracts for the construction of ships were first entered into in 1915 by the Standifer-Clarkson Co., the partnership. In each of the organizations, all the property, assets, business, contracts, and organization of the predecessor corporations or partnerships were passed on and the liabilities assumed, all of which found their way into the taxpayer, the Standifer Corporation. The Standifer Corporation was the successor to a business existing on August 1, 1914.

3. The Standifer Corporation received its first United States Government contract to construct ships on May 14, 1917. On that date it entered into a contract with the United States Shipping Board Emergency Fleet Corporation (hereinafter referred to as the Fleet Corporation), for the construction of ten wood cargo-carrying steamers, complete with propelling machinery, auxiliaries and equipment, at a price of $500,000 for each complete ship. This contract was known by the parties and will be hereinafter referred to as Contract 3–WC. To carry out this contract the North Portland shipyard was enlarged and a site for a second shipyard was procured on June 1, 1917, at Vancouver, Wash., where the construction of a wood shipyard was started immediately and rapidly carried to completion.

4. The Standifer Corporation at various times secured six contracts with the Fleet Corporation, a summary of which is as follows:

| Date of Contract. | Name of Contract. | Kind and Number of Ships. | Lump Sum Price Each. | Total Price. |
|---|---|---|---|---|
| May 14, 1917 | 3–WC | 10 Wooden | $500,000 | $5,000,000 |
| January 8, 1918 | 156–SC | 10 Steel | 1,757,500 | 17,575,000 |
| February 1, 1918 | 176–WC | 6 Wooden | 720,000 | 4,320,000 |
| September 30, 1918 | 503–SC | 5 Steel | 1,820,000 | 9,100,000 |
| October 2, 1918 | 508–WH | 4 Wooden Hulls | 340,000 | 1,360,000 |
| October 2, 1918 | 509–WC | 6 Wooden | 685,000 | 4,110,000 |

Each of the above contracts provided for a lump sum purchase price and a stipulated time for completion, with penalties for delay. G. M. Standifer, R. V. Jones and L. B. Menefee, whose joint wealth was approximately $5,000,000, jointly and severally guaranteed the full and faithful performance of contracts 3–WC, 156–SC, and 176–WC. R. V. Jones and L. B. Menefee likewise guaranteed the performance of contract 503–SC. The guarantees were an important factor in procuring the contracts with the Fleet Corpora-

tion and the advance of $1,300,000 with which to enlarge the steel shipyard, and it was their credit, endorsement and guarantees which enabled the Standifer Corporation to procure the necessary funds to carry on its work.

5. Late in 1917 the Fleet Corporation offered the Standifer Corporation a contract for the construction of ten steel cargo-carrying steamers, upon the condition that the Standifer Corporation would secure a site and build a steel ship plant. As an inducement for the acceptance of this contract, the Fleet Corporation promised a second contract for ten steel ships. The Standifer Corporation immediately secured a lease from the Port of Vancouver on property located about one mile distant from the Vancouver wood shipyard plant. Thereupon the contract for ten steel ships, referred to above as contract 156–SC, was entered into with the Fleet Corporation.

6. The contracts entered into in 1917 and the early part of 1918 immediately presented the serious problem of housing the employees. By February 1, 1918, the Standifer Corporation had obligated itself to construct 26 ships and a new shipyard for steel vessels, all of which had to be rushed to completion by the stipulated time to avoid penalties. The work outlined required from eight to ten thousand men. The shipyards were in the outskirts of the City of Vancouver, Wash. The city then had a population of about 12,000. All its hotels and residences were occupied. There was also an understanding with the Fleet Corporation that the labor was not to be drawn from shipyards about Vancouver doing similar work but that new labor must be brought in. This necessitated the building of living quarters for the men and their families, which the Standifer Corporation or private capital was unable or unwilling to finance owing to the uncertain duration of the employment. The Fleet Corporation in the emergency indicated a willingness to assist and finance such housing facilities. In order to house and feed men to construct the new shipyard itself, the Standifer Corporation built barracks and a mess house to take care of 700 men. The building of barracks and cantonments at the shipyard did not meet with the approval of the Fleet Corporation, as it required houses, cottages and hotels for the employees. Beginning early in January, 1918, negotiations took place between the representatives of the Fleet Corporation and the Standifer Corporation concerning the furnishing of such housing facilities, the Fleet Corporation offering to advance, by way of a loan, a sum not exceeding $350,000, either to the Standifer Corporation or to an independent corporation organized for the purpose of providing such facilities. The negotiations and acts of the parties to carry out this plan were as follows:

To provide the land on which to construct the housing facilities the Standifer Corporation, on or about April 3, 1918, purchased and paid for approximately 17 acres of land on the outskirts of the City of Vancouver, at a cost of $10,000. The promise to advance the $350,000 with which to erect the housing facilities (made on or about April 1, 1918) was confirmed by a letter from the Fleet Corporation, dated May 11, 1918. This letter outlined the terms and conditions upon which the advance would be made, one of which was that the papers were to be drafted by the Fleet Corporation and were to provide, at the Fleet Corporation's option, either for the construction and holding of the housing facilities by the Standifer Corporation, or by an independent corporation to be organized. Another condition was that the Fleet Corporation was to control the rentals and sales and impose such other restrictions as it should deem proper. By a letter dated May 29, 1918, the Standifer Corporation notified the Fleet Corporation that it had purchased land for the housing project, and enclosed maps showing its location, as well as the plans and specifications for the hotels and cottages to be erected.

The Standifer Corporation was then advised by the counsel of the Fleet Corporation that the housing operations could not be carried on by the Standifer Corporation and that a separate corporation must be formed to take over that activity. In compliance with the instructions of the Fleet Corporation, the Home Company was organized and incorporated under the laws of the State of Washington, on June 6, 1918, with an authorized capital stock of $20,000.

With a letter dated June 12, 1918, the Fleet Corporation returned the maps and blueprints which had been submitted to it by the Standifer Corporation on May 29, 1918. By this same letter the Fleet Corporation made general and specific criticisms of the plans and recommended numerous changes, including the purchase of 17 additional acres of land on which to erect the facilities. On June 11, 1918, the 17 acres of land purchased by the Standifer Corporation were transferred to the Home Company in exchange for its entire authorized capital stock of $20,000.

In order to comply with requirements of the Fleet Corporation, 17 acres of land adjoining the 17 acres purchased on April 3, 1918, were purchased by the Standifer Corporation on June 22, 1918, at a cost of $14,000. On the same day (June 22, 1918) this land was transferred by the Standifer Corporation to the Home Company.

By a letter dated June 26, 1918, the Standifer Corporation notified the Fleet Corporation of its arrangements for the additional land needed for the housing facilities and submitted maps and blueprints of the plans and specifications, revised so as to meet

the requirements of the Fleet Corporation. On or about July 1, 1918, counsel for the Fleet Corporation presented for execution instruments prepared by him for the carrying out of the housing program. They were:

(A) An instrument known as "Advance Money Mortgage Agreement," which was an agreement between the Standifer Corporation and the Home Company, which provided, among other things, that the former would advance to the latter $350,000 (or so much as might be necessary) to erect 100 dwelling houses and a hotel or hotels to accommodate approximately 500 men; that the Home Company would execute and deliver to the Standifer Corporation its bond in the sum of $350,000, secured by a first mortgage on its properties, and that the Standifer Corporation might assign its interest therein to the Fleet Corporation. This agreement, as well as the bond and mortgage, was duly executed and delivered.

(B) An instrument known as " The Operating Agreement," which was a three-party agreement between the Standifer Corporation, the Home Company and the Fleet Corporation, pursuant to which the Standifer Corporation agreed to assign to the Fleet Corporation its rights and interest under the Advance Money Mortgage Agreement, the bond and mortgage of the Home Company for $350,000, and the stock of the Home Company, and guaranteed the performance of the contract by the Home Company. The Fleet Corporation agreed to assume the obligations of the Standifer Corporation under the Advance Money Mortgage Agreement.

These instruments were duly executed and delivered.

By an instrument dated July 30, 1918, the Standifer Corporation assigned the bond and mortgage of the Home Company to the Fleet Corporation, and the latter thereupon advanced to the said Home Company the sum of $350,000. Under the agreements entered into between the Standifer Corporation, the Home Company and the Fleet Corporation, 20 cottages and a hotel of 248 rooms were erected in 68 working days, the construction work being completed in October, 1918.

Under the contracts of September 30 and October 2, 1918, the Standifer Corporation agreed to maintain a complete shipbuilding plant so located as to have available for its employees housing accommodations satisfactory to the Fleet Corporation. Need for housing accommodations in addition to those under construction became necessary. The Fleet Corporation agreed to advance additional funds to build the facilities upon the condition that the Standifer Corporation would guarantee the Home Company's mortgage. The Standifer Corporation was at that time under contract to construct 41 ships and a steel shipyard in which to build 15 of such ships. The total consideration involved was $41,465,000.

The contracts called for the delivery of the ships within a definite limited time, with penalties for delays. A mortgage on all its properties, in the amount of $1,300,000, had been given to the Fleet Corporation. Under these conditions, the Standifer Corporation accepted the terms of the Fleet Corporation's offer in connection with the additional housing facilities. Work on the additional housing facilities was started immediately and before the promised advances were made by the Fleet Corporation. On November 22, 1918, the Standifer Corporation was notified by the Fleet Corporation to stop work on such additional facilities.

Subsequent to July 30, 1918, and on or about January 28, 1919, a contract was entered into between the Standifer Corporation and the Home Company known as the " Corrected Advance Money Mortgage Agreement," wherein and whereby it was mutually agreed as follows:

The " Corrected Advance Money Mortgage Agreement " was substituted in place of the "Advance Money Mortgage Agreement," as the latter did not express the intent of the parties. The material changes effected by the correction of the Advance Money Mortgage Agreement were that the Standifer Corporation and the Fleet Corporation lost their right to elect to terminate the agreement with the Home Company at any time, and it was expressly provided in the Corrected Advance Money Mortgage Agreement that no assignment by the Standifer Corporation to the Fleet Corporation of its interest under such Advance Money Mortgage Agreement or Corrected Advance Money Mortgage Agreement should be construed as a release of the Standifer Corporation from any liability or obligation imposed upon or assumed by it to the Fleet Corporation.

On or about June 28, 1919, an operating agreement was made and entered into between the G. M. Standifer Construction Corporation, called the shipbuilder, the Vancouver Home Company, called the " Home Company," and the United States Shipping Board Emergency Fleet Corporation, called the " Fleet Corporation." This agreement corrected the agreement which was made July 1, 1918, and was to take the place of the former agreement, relating by its terms back to the date of the first operative agreement. This agreement provided that the shipbuilder assign and transfer to the Fleet Corporation the right, title and interest of the shipbuilder to the general money mortgage agreement and the privileges and benefits thereunder. The shipbuilder, in that agreement, guaranteed the faithful performance of all the covenants, terms and conditions and undertakings on the part of the Home Company which that company had agreed to perform. It guaranteed the payment of a bond and mortgage of the Home Company. That agreement further provided that the Fleet Corporation would make loans and

advances to the Home Company agreed to be made by the shipbuilder to the Home Company under the general money mortgage agreement. The shipbuilder, a construction company, assigned and transferred to the Fleet Corporation all of the outstanding capital stock of the Home Company as security for the performance of the covenants and agreements entered into by the construction company. The agreement provided that the construction company should continue to hold and exercise all voting and other rights appertaining to such pledged stock so long as the construction company should not be in default under the contract. It was also provided that the Home Company should not lease or sell any of the land or buildings, except to persons employed by the construction company, either as officers or employees, upon the construction of vessels for the United States, and further provided that the Fleet Corporation should fix and determine the prices at which any property owned by the Home Company included in the blanket mortgage which was referred to in the contract might be sold and the prices at which any portion might be leased or rented, except that the Home Company would not be required to sell property at less than cost or to rent property at an annual rental of less than 10 per cent of the cost of the land plus the cost of improvements thereon less an allowance for physical depreciation as specifically set out in the contract.

The Fleet Corporation, in pursuance of its authority under the Operating Agreement, regulated the rentals and sales of the housing facilities and properties and decided all questions of policy affecting the Home Company. The capital stock of the Home Company was at all times owned and controlled by the Standifer Corporation. The Home Company was not recognized by the Fleet Corporation or by the Standifer Corporation as a separate corporate entity, except as it is so mentioned and referred to in the various agreements. All of the correspondence that the Fleet Corporation had concerning the housing facilities was addressed to the Standifer Corporation. The activities of the Home Company were at all times considered and treated by the Standifer Corporation as a part or department of its own business and were so handled on its books. The Home Company did not function as an independent or ordinary corporation with an independent entity, but was in fact merely a department, agency or instrumentality of the Standifer Corporation, at all times under the complete domination and control of the Standifer Corporation and the Fleet Corporation. The Home Company was not a party to the final settlement agreement of July 15, 1922, (hereinafter referred to) between the Standifer Corporation and the Fleet Corporation, under which all the claims, rights and liabilities of the Home Company and the Fleet Corporation were settled and adjusted.

Subsequent to the execution of the above-mentioned instruments relating to housing, and at the request of the Fleet Corporation, the construction of housing facilities in addition to those theretofore agreed upon was begun. The work on these additional facilities was abandoned shortly after the Armistice, and settlement on account thereof was had with the Fleet Corporation by an agreement dated February 6, 1919, a copy of which follows:

THIS AGREEMENT made in quadruplicate the 6th day of February, 1919, by and between the VANCOUVER HOME COMPANY, a corporation of the State of Washington, hereinafter called the Contractor; the G. M. STANDIFER CONSTRUCTION CORPORATION, a corporation of the State of Oregon, hereinafter called the Shipbuilder, and the UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION, a corporation of the District of Columbia hereinafter called the Corporation.

WITNESSETH: That

WHEREAS, the Contractor and the Shipbuilder have heretofore entered into an agreement, called the Advance Money Mortgage Agreement, for the construction of certain buildings at Vancouver, Washington, for dwelling purposes and to be used as an aid and furtherance to the construction by the Shipbuilder for the Corporation of vessels, and

WHEREAS, the said parties hereto have heretofore entered into an agreement known as the Operating Agreement affecting the use and operation of said buildings, and

WHEREAS, said Advance Money Mortgage Agreement and Operating Agreement have by instruments dated January 28, 1919, been redrafted as the corrected Advance Money Mortgage Agreement and the corrected Operating Agreement, and

WHEREAS, the Shipbuilder during the summer of 1918, began the construction of a housing development at Vancouver, Washington, in addition to the housing development provided for in said Advance Money Mortgage Agreement and Operating Agreement, said additional construction being upon the request of the said Corporation, and

WHEREAS, said Shipbuilder on account of said additional housing development has incurred certain obligations and made certain commitments and spent certain moneys, and

WHEREAS, the Corporation has directed the Shipbuilder to cease work upon said additional housing development, and

WHEREAS, it is the desire of all the parties hereto that an adjustment be had of their mutual obligations on account of said additional housing development; and in order to effectuate the same

It is, therefore, agreed that said additional housing development shall stand as cancelled and at an end. The unused materials on hand in the possession of the Shipbuilder and/or the Contractor shall be the property of the Shipbuilder and the Shipbuilder will pay out of its own funds all of the commitments and obligations heretofore made and not already paid on account of both the original housing development under said Advance Money Mortgage Agreement and Operating Agreement and also under the said additional housing development. In other words all of the obligations of either the Contractor or the Shipbuilder for or on account of either or both developments shall be paid by the Shipbuilder out of its own funds; the Shipbuilder, however, and Contractor agree to complete at their own expense houses No. 19 & 20, the construction of which has already been commenced under the original

housing development and according to the plans and specifications heretofore agreed upon by the parties hereto.

It is further agreed that the Corporation shall pay to the shipbuilder the sum of Thirty Five thousand three hundred nineteen dollars and twenty-six cents ($35,319.26) which represents an estimated loss to the Contractor and Shipbuilder on account of said additional housing development.

It is also understood and agreed that the full amount of Three hundred fifty thousand dollars ($350,000) provided in said Advance Money Mortgage Agreement and Operating Agreement to be advanced by the Corporation for the development mentioned therein has been fully advanced by the Corporation.

By this agreement it is understood that the Corporation has complied with all of its obligations to the Contractor and/or the Shipbuilder on account of the said original housing development as set forth in said Advance Money Mortgage Agreement and said Operating Agreement and also on account of said additional housing development, and the Contractor and Shipbuilder stand obligated to repay according to the terms of said Advance Money Mortgage Agreement, Operating Agreement, bond and mortgage given thereunder, all of the sums which might have been due the Corporation under said Agreements.

This Agreement shall not be construed to be in any wise a modification of the obligations of the Contractor and Shipbuilder to the Corporation under said Advance Money Mortgage Agreement and Operating Agreement as corrected.

7. On or about July 14, 1918, Charles Piez, general manager, and Charles M. Schwab, chairman, of the Shipping Board, while on an inspection tour of the shipyards on the Pacific Coast, visited the Standifer Corporation's plant. It was apparent at this time that, owing to the delays on the part of the Fleet Corporation in furnishing plans and specifications, as well as its method of controlling labor and materials, together with the general war conditions existing, the cost of the ten wooden cargo-carrying steamers under Contract 3–WC would greatly exceed the lump sum price of $500,000 specified in the contract, and that the Standifer Corporation would be unable to finance the work. Piez and Schwab were informed of these conditions. The Standifer Corporation offered to discontinue the work, turn its yard over to the Fleet Corporation and assume its then accrued loss. This offer was not accepted. The Standifer Corporation was, however, advised to proceed with the work with the understanding that, after the ships were completed, it should submit a statement of their cost, at which time the Fleet Corporation would consider whether or not the contract price should be readjusted on the basis of just compensation as provided in the statute.

Following this visit the Fleet Corporation agreed that, in addition to the funds already advanced, it would advance $1,300,000 "or as much thereof as may be necessary, for such items of plant extensions to " the Vancouver Steel Shipyards " as the district officer may decide to be necessary." The terms were (1) that the advances

should be made as required and should bear interest at 5 per cent; (2) that the Standifer Corporation should execute and deliver a mortgage to secure the repayment of the advances, which should be a first lien on all its properties; and (3) that the repayment of the advances should be guaranteed personally by Jones, Standifer and Menefee. The $1,300,000 so agreed to be advanced was advanced and a mortgage for the full amount thereof as required by the agreement of July 18, 1918, was executed and deliverd under date of October 18, 1918. By an instrument in writing dated July 30, 1918, G. M. Standifer, L. B. Menefee and R. V. Jones, jointly and severally, guaranteed the repayment to the Fleet Corporation of the above-mentioned mortgage loan of $1,300,000.

8. Two of the ships under Contract 3–WC were completed and delivered in 1918. The remaining eight ships under this contract were delivered in 1919, two of the eight being completed and delivered as hulls only. All of the ships under Contract 176–WC were completed and delivered in 1919. Three of the hulls under Contract 508–WH were delivered in 1919. Work on the fourth hull under this contract was suspended on March 7, 1919, and canceled on March 23, 1919. Contract 503–SC was suspended February 11, 1919, and canceled November 1, 1919. Contract 509–WC was suspended November 23, 1918, and canceled March 26, 1919. Seven of the ships under Contract 156–SC were completed and delivered in 1919 and three in 1920, the last one on February 26, 1920.

9. The Vancouver Wood Shipyards were shut down November 28, 1919. The total depreciated cost of the assets of the Vancouver Wood Shipyards acquired in the years 1917 and 1918 and subsequent to April 7, 1917 (before taking into consideration any deduction for amortization or any reimbursement of plant cost made to the tax-payer in its final settlement with the Fleet Corporation) amounted to $480,163.05. All of the movable equipment for which a market could be found was sold and the balance of the property, consisting mainly of buildings, ways and land improvements, reverted to the City of Vancouver in accordance with the terms of the lease. The total salvage recovered by sales amounted to $41,905.25, leaving a depreciated cost, less salvage, of $438,257.80.

10. Ship construction in the North Portland Shipyard was completed in September, 1919, and the plant shut down. This plant was totally destroyed by fire in May, 1920. The total depreciated cost of the assets acquired in the years 1917 and 1918, subsequent to April 7, 1917, in the construction of this yard (before taking into consideration any deduction for amortization or any reimbursement of the plant cost made to the taxpayer in its final settlement with the Fleet Corporation) amounted to $185,753.22. Prior to the fire

a small amount of machinery was sold for $1,260, and, after the fire, insurance was recovered in the amount of $124,865, making the total salvage recovered the amount of $126,125, leaving a depreciated cost, less salvage, of $59,628.22.

11. The last vessel constructed at the Vancouver Steel Shipyard plant under contract with the Fleet Corporation was delivered February 26, 1920, and from that date until May 27, 1921, this plant was used for the construction of steel vessels for commercial purposes, after which last-named date the yard was shut down. The total cost incurred during the years 1918, 1919, and 1920, in the construction of this shipyard (before taking into consideration any deduction for amortization or any reimbursement of plant cost made to the taxpayer in its final settlement with the Fleet Corporation) amounted to $2,388,853.62. Sales of machinery and equipment and furniture and fixtures during the year 1922 resulted in a salvage recovered in the amount of $185,045.60, and during the year 1923 the remainder of the plant was sold to the City of Vancouver for $12,500, making the total salvage thus recovered by sales $197,545.60. Of the amount of $2,388,853.62 representing said total cost of this plant, $91,399.46 was expended during 1920 for commercial purposes and not for the production of articles contributing to the prosecution of the war against the German Government. The total salvage value recovered from sales is therefore reduced in proportion to the disallowed costs ($91,399.46) and the final salvage allowed amounts to $191,105.61. The depreciation for the postwar use is $240,435.00. The residual value is therefore $191,105.61, plus $240,435.00, or $431,540.61, and said total cost, less postwar depreciation, salvage and postwar plant expenditures, is $1,865,913.55.

12. The total cost of the facilities of the Home Company during the years 1918 and 1919 (before taking into consideration any deduction for amortization or any reimbursement of plant cost made to the taxpayer in its final settlement with the Fleet Corporation) amounted to $397,133.94. The entire project, including real estate, hotel, cottages and land improvements, was sold in February, 1923, for $50,000. In the determination of the deficiency the Commissioner has allowed nothing whatever for amortization of the cost of the above-mentioned housing facilities. The amortization deduction of $1,963,887.93 has been allocated by the Commissioner in accordance with the gross sales of the respective periods, covered by the amortization period, in the following manner:

| | |
|---|---:|
| 1918 | $150,945.66 |
| 1919 | 1,686,355.44 |
| 1920 | 126,586.22 |
| Total | 1,963,887.32 |

13. The Commissioner has determined that a "contractual amortization" allowance of $399,911.64 was made to the appellant Standifer Corporation by the Fleet Corporation, and in the determination of the deficiencies he has allocated such allowance in the following manner:

| | |
|---|---:|
| Vancouver Wood Shipyard | $164,724.19 |
| North Portland Wood Shipyard | 20,564.20 |
| Vancouver Steel Shipyard | 214,623.25 |
| Total | 399,911.64 |

14. The amounts finally allowed by the Commissioner as amortization on the respective yards are as follows:

| | |
|---|---:|
| Vancouver Wood Shipyard | $273,533.61 |
| North Portland Wood Shipyard | 39,064.02 |
| Vancouver Steel Shipyard | 1,651,290.30 |
| Total | 1,963,887.93 |

These amortization allowances were arrived at after deducting the allowances set out in paragraph 13 above.

15. The following tabulation shows the gross sales of the Standifer Corporation from its contracts with the Fleet Corporation and from its peace-time contracts for each of the years 1918, 1919, and 1920:

| | Gross Sales Fleet Corporation Contracts. | Gross Sales Peace-Time Contracts. |
|---|---:|---:|
| 1918 | $1,429,053.88 | $926,204.01 |
| 1919 | 24,524,066.07 | None. |
| 1920 | 5,594,341.12 | 10,060,196.97 |
| Total | 31,547,461.07 | 10,986,400.98 |

16. The following tabulation shows the net income derived or net loss sustained by the Standifer Corporation from its contracts with the Fleet Corporation and from its peace-time contracts for each of the years 1918, 1919, and 1920, before the deduction of any amount whatever for amortization:

| | Fleet Corporation Contracts. | Peace-Time Contracts. |
|---|---:|---:|
| 1918 Loss | $61,430.61 | $1,666.21 |
| 1919 Profit | 1,778,052.73 | None. |
| 1920 Profit | 843,738.26 | 749,468.14 |
| | 2,621,790.99 | 749,468.14 |
| Less 1918 Loss | 61,430.61 | 1,666.21 |
| Net profit | 2,560,360.38 | 747,801.93 |

17. The result of the operations of the Home Company during the amortization period, as determined by the Commissioner before the allowance of any deduction for amortization, was the following:

| | | |
|---|---:|---:|
| June 6, to Dec. 31, 1918—Net income | | $613. 46 |
| Calendar year 1919—loss | $3, 170. 57 | |
| Jan. 1, to Feb. 26, 1920—Net income | | 2, 992. 88 |
| | 3, 170. 57 | 3, 606. 34 |
| Less net loss, 1919 | | 3, 170 57 |
| Net income for period | | 435. 77 |

18. The net income, invested capital and profits tax of the consolidated group, for the years 1919, 1920 and 1921, as determined by the Commissioner, are as follows:

| | Net Income. | Invested Capital. | Profits Tax.[1] |
|---|---:|---:|---:|
| 1919 | $68, 934. 81 | $20, 917. 22 | $44, 247. 85 |
| 1920 | 1, 473, 097. 38 | 20, 916. 66 | 900, 591. 86 |
| 1921 | 536, 061. 90 | None. | 209, 820. 76 |

[1] The above profits tax was computed for each of said years under section 302 of the Revenue Acts of 1918 and 1921.

19. The taxpayer's notes payable, accounts payable and mortgages payable, were the following:

| | Jan. 1, 1919. | Dec. 31, 1919. | Dec. 31, 1920. | Dec. 31, 1921. |
|---|---:|---:|---:|---:|
| Note payable | $790, 693. 67 | $49, 943. 52 | None. | None. |
| Accounts payable—trade | 4, 098, 018. 32 | 1, 484, 133. 78 | $293, 067. 11 | $404, 883. 44 |
| Accounts payable—others | 772, 390. 88 | 220, 867. 00 | 218, 449. 60 | 186, 761. 43 |
| Mortgages payable | 1, 650, 000. 00 | 1, 643, 958. 13 | 1, 627, 838. 07 | 1, 627, 838. 07 |
| Totals | 7, 311, 102. 87 | 3, 398, 902. 43 | 2, 139, 354. 78 | 2, 219, 482. 94 |

20. The above mentioned item "mortgages payable" comprised (1) the mortgage of $1,300,000 given by the Standifer Corporation to the Fleet Corporation, and (2) the mortgage bond of $350,000 given by the Home Company to the Standifer Corporation and by it assigned to the Fleet Corporation with the guarantee of the Standifer Corporation. The reductions in the "mortgages payable" account, set out above, represented the proceeds of sales of plant items, which proceeds were paid to the Fleet Corporation and applied on the mortgage. At the completion of Contract No. 156–SC on February 26, 1920, and at all times thereafter, the Standifer Corporation claimed that it had earnings due from the Fleet Corporation sufficient to pay in full the said mortgage, but although it requested the satisfaction of such mortgage the Fleet Corporation did not satisfy the mortgage until the time of the final settlement in July, 1922.

21. No part of the gross income of the taxpayer for any of the taxable years under consideration in this appeal consists of gains, profits, commissions, or other income, derived on a cost-plus basis from a Government contract or contracts.

22. The only activity of the Home Company during its entire existence, and particularly from the date of organization to December 31, 1921, consisted of constructing certain housing facilities and renting them to the laborers in the Standifer Corporation's shipyards, and operating a hotel and eating house for the accommodation of such laborers, for which the said laborers paid the said Home Company compensation. Allowance for ordinary depreciation on the Home Company's housing facilities was made by the Commissioner in the computation of the deficiency upon which this appeal is predicated.

23. After the Standifer Corporation was definitely advised that the shipbuilding program of the United States Shipping Board Emergency Fleet Corporation was closed, that canceled contracts would not be reinstated and that additional contracts would not be placed, it prepared claims against the Fleet Corporation for the payment of certain sums claimed to be due under the various contracts with the Fleet Corporation. The total of the claims so prepared was $11,389,402.65. The first of these claims was presented on September 24, 1920, and the last on December 15, 1920. Included in these claims, aggregating $11,389,402.65, as a part of the cost of the ships delivered to the Fleet Corporation, and as an element of damages for suspended and canceled contracts, were items of depreciation and amortization of plant facilities, which plant facilities were erected, installed or acquired in part prior and in part subsequent to April 6, 1917. Certain additional items claimed by the Standifer Corporation to be due it from the Fleet Corporation were not included in the claims so presented and filed.

24. These claims were pending for many months and many conferences were held in Portland, Oreg., Philadelphia, Pa., and Washington, D. C., the Fleet Corporation being furnished with complete details of the claims so presented and filed. These claims were examined by the Construction Claims Board of the United States Shipping Board and on April 16, 1921, the latter made certain recommendations to the Shipping Board and the United States Shipping Board Emergency Fleet Corporation as to settlement thereof.

25. Acting on the recommendation of the Construction Claims Board, the trustees of the Emergency Fleet Corporation on May 26, 1921, passed a resolution recommending to the Shipping Board that a settlement of these claims be made and prescribing the terms and

conditions on which the settlement should be made. The recommendations contained in such resolution were approved on the same date (May 26, 1921) by Admiral W. S. Benson, acting as chairman of the United States Shipping Board under authority of the President of the United States, and agreed to by the Standifer Corporation. This award (known as the Benson award) included amortization of the wooden shipyard plants at Vancouver and at North Portland, and a settlement of the housing project. The provisions in respect to those items were as follows:

4. That Contract No. 3–WC be settled on the basis of "Just Compensation", just compensation to consist of the actual cost to the Contractor without profits, and as usually defined in Emergency Fleet Corporation cost-plus contracts, including:

\*        \*        \*        \*        \*        \*        \*

(c) Amortization of the Wooden Shipyard Plants at Vancouver and North Portland, covering the cost of the plants, less residual value proportionate to this contract on the basis of contract tonnage of all vessels contracted for, to be built in these yards since the yards were acquired by the Contractor.

5. That the Housing Project organized by the Contractor under the title " Vancouver Home Company " for which the Emergency Fleet Corporation advanced the sum of $350,000 to finance said project and for which, under the final terms of the loan contract, the Contractor was made surety for the loan to the realty company, be taken over by the G. M. Standifer Construction Corporation, the Contractor to pay the Emergency Fleet Corporation the sum of $162,500.00 in full and final settlement of said loan, and the Emergency Fleet Corporation to release all right, title and interest therein on payment of said $162,500.00.

The maximum award on all claims was $2,791,725.07, the recommendations providing:

12. That said Contractor's final reimbursement under this resolution shall in no event exceed the amount of $2,791,725.07, said amount to include the reimbursements provided for under the foregoing clauses of this resolution, and all contract reimbursements.

13. That until the amounts set forth in this resolution are definitely determined in accordance with the provisions thereof, the Contractor shall not be advanced, on account of this claim, any sum in excess of $1,000,000.00.

On June 8, 1921, $500,000 was paid to and received by the Standifer Corporation. The pertinent part of the voucher upon which such payment was made was as follows:

Payment on account of progress payments due under Contract #156–SC, said payment to be deducted from total payment of $2,791,725.07, account progress payments and cancellation claims as approved subject to audit, by the Board of Trustees U. S. S. B. E. F. C. and by the Chairman on May 26, 1921, such payment being a portion of said total payment specifically referred to in paragraph 12 of said resolution, $500,000.00.

A reorganization of the Shipping Board, pursuant to a change in the law, took place about this time, and the question arose as to whether the Shipping Board was legally bound by the aforesaid

Benson award of May 26, 1921. On account of this question as to the validity of the said Benson award, on October 4, 1921, a letter was received by the Standifer Corporation from the assistant general counsel of the United States Shipping Board, offering to make a payment of an additional $500,000 to the Standifer Corporation if it would accept the terms of the Benson award as the basis of a settlement of its claims. This proposal was accepted by the Standifer Corporation and a resolution was passed by the Claims Commission of the Shipping Board, but on objection of its general counsel the payment of the additional $500,000 was never made and the chairman and general counsel refused thereafter to recognize the validity of the Benson award or settle in accordance with its terms.

26. The audit provided for in the so-called Benson award was completed by the Fleet Corporation some time later in 1921 and showed a balance due the Standifer Corporation of $1,349,611.82, after charging it with the payment of $500,000 made on June 8, 1921. Neither the Standifer Corporation nor the Fleet Corporation was satisfied to settle on the basis of this audit. The Standifer Corporation at that time and thereafter claimed that there was then due it on all accounts from the Fleet Corporation the net sum of $2,611,593.86, after giving recognition to the $2,791,725.07 limitation contained in the Benson award and after deducting the payment of $500,000 made on June 8, 1921.

27. Commencing on April 20, 1922, and continuing to April 28, 1922, the Standifer Corporation's claims were being heard by the Claims Commission of the United States Shipping Board. At these hearings the representatives of the Shipping Board took the position that the so-called Benson award was not binding upon it. They also took the position that, if said Benson award was not binding upon the parties, the Standifer Corporation was not entitled to any allowance for amortization or reimbursement of the cost of plant facilities. The Standifer Corporation, however, insisted at all times through those hearings and down to the date of final settlement that both parties were bound by said Benson award of May 26, 1921, and that it was entitled to the allowances for amortization or reimbursement of the cost of plant facilities provided for in said Benson award. The said Claims Commission made a specific ruling during such hearings that said Benson award constituted an agreement binding on both parties, but no final decision was ever reached by the Claims Commission as a result of these hearings determining the amount due the Standifer Corporation.

Under date of May 9, 1922, the Standifer Corporation, acting through its agent and attorney, submitted to the Claims Commission a detailed statement of what it claimed to be the result of a

proper audit under the terms of the Benson award, the aggregate net amount of such audit being $3,069,728.05 and the cash amount claimed being $2,611,593.86, after giving effect to the limitation prescribed by the Benson award and deducting the aforesaid payment of $500,000 made on June 8, 1921. Under date of May 20, 1922, the representatives of the Shipping Board submitted to the said Claims Commission a memorandum in which it claimed that the total amount due the taxpayer under a proper audit of the Benson award, if that award was binding upon it, was $1,349,611.82.

28. On July 15, 1922, a final settlement was made of all amounts in dispute between the Fleet Corporation and the Standifer Corporation. Such final settlement was embodied in a written agreement dated July 15, 1922, which was as follows:

SETTLEMENT AGREEMENT AND RELEASE AFFECTING CONTRACTS WC–3, SC–156, WC–176, SC–503, WH–508, WC–509, WITH THE G. M. STANDIFER CONSTRUCTION CORPORATION.

AGREEMENT entered into this 15th day of July, 1922, between G. M. Standifer Construction Corporation, a corporation organized and existing under the laws of the State of Oregon, party of the first part, and United States Shipping Board, acting as such and also in behalf of Government of the United States of America, by United States Shipping Board, Emergency Fleet Corporation, a corporation organized and existing under the laws of the District of Columbia, and hereinafter referred to as the Fleet Corporation, party of the second part, WITNESSETH:

WHEREAS, the party of the first part and the United States Shipping Board Emergency Fleet Corporation, representing the United States of America, have heretofore entered into various contracts, agreements, and mortgages, to-wit:

Contract W. C. 3, dated May 14, 1917, for the construction of 10 wooden steamships,

Contract S. C. 156, dated January 8, 1918, for 10 steel steamships,

Supplemental agreement to Contract 156, dated July 18, 1918, providing for payment of interest,

Contract W. C. 176, dated February 1, 1918, for 6 wooden steamships,

Contract 503, dated September 20, 1918, for 5 steel ships,

Contract W. H. 508, dated October 2, 1918, for 4 wooden hulls,

Contract W. C. 509, dated October 2, 1918, for 6 wooden steamships,

Mortgage on three plants of the G. M. Standifer Construction Corporation, dated October 18, 1918, in the sum of $1,300,000.

Bond in sum of $350,000 and mortgage to secure same, both dated July 1, 1918, given by Vancouver Home Company, a corporation organized and existing under the laws of the State of Oregon, to the G. M. Standifer Construction Corporation, the bond being endorsed, guaranteed, and delivered to the Fleet Corporation, and the mortgage assigned by the G. M. Standifer Construction Corporation to the Fleet Corporation.

WHEREAS, the following contracts have been heretofore cancelled by the United States Shipping Board Emergency Fleet Corporation; namely,

Contract S. C. 503,

Contract W. C. 509,

1 vessel cancelled under Contract W. H. 508, and

WHEREAS, all other vessels mentioned in the various contracts have been completed and accepted; and

WHEREAS, during the execution of the work and performance of said contracts, various controversies, disputes, and disagreements arose and have not heretofore been fully settled and agreed upon; and

WHEREAS, the contractor has presented various claims for the cancellation of the said three contracts above mentioned as well as claims in connection with certain instructions and letters given regarding Contract W. C. 3; and

WHEREAS, the contractor has various other claims regarding wage reimbursement, changes and extras, eliminations, charge backs, freight differential, interest, and damages arising from various causes to date; and

WHEREAS, it is the desire and intention of both parties to fully and completely settle, compromise, and adjust all of said claims, as well as any other claims of any character, kind, or nature whatsoever that the party of the first part may have on account of the matters above mentioned, or any other claims arising from any cause whatsoever; and

WHEREAS, it is also the intention of the parties that the party of the second part shall in view of the settlement made by this contract fully settle, adjust, liquidate, and release all claims of whatsoever nature that it may have against the party of the first part and the Vancouver Home Company;

Now, THEREFORE, in consideration of the premises and the mutual covenants herein contained, and upon other good and valuable considerations, it is agreed by the parties hereto as follows:

FIRST

The said party of the second part shall forthwith pay to the party of the first part the sum of $998,416.23,

SECOND

The party of the second part shall take over and assume responsibility for the settlement of all proper commitments for undelivered materials applying to cancelled hulls under Contracts 508, 509, and 503, S. C., including commitment to Fred C. Ballin for royalties, and to release the party of the first part of all liabilities thereon providing the party of the first part shall promptly notify the party of the second part of any claims made against the party of the first part by reason of said commitments or of any suits filed against the party of the first part on account of any of said commitments, and providing further that the party of the first part shall at all times render such assistance and furnish such records as are necessary to properly investigate or defend any claims or action that may be brought in connection with said commitments. It is understood and agreed that any property or benefits accruing from the settlement of these commitments are to be and belong to the party of the second part and the first party hereby agrees that the second party shall have and receive credit for whatever sums have been advanced to any sub-contractors by the party of the first part. It is further agreed and understood that all materials of whatsoever kind, character, or description now in the yards of the party of the first part shall be and remain the property of the party of the first part.

THIRD

The party of the first part agrees to indemnify and hold the party of the second part harmless against a certain action brought by the Pacific Marine Iron Works in the circuit court of the State of Oregon for Multnomah County

for the sum of $48,156.50, or any other action brought by the Pacific Marine Iron Works with reference to the subject matter of said suit.

### FOURTH

The greater part of the work under the various contracts above mentioned was carried out under a financial arrangement commonly known as an Imprest Fund, the Fleet Corporation advancing money to take care of the payrolls, etc. A number of workmen and other employees have not called for the checks due them for work, or have lost the checks, or for various other reasons the checks issued in payment for certain wages have not been cashed. The approximate amounts of these uncalled for wages is $30,000. The Fleet Corporation has heretofore required the party of the first part to retransfer or pay back to the Fleet Corporation the full amount of said unclaimed wages. In order to settle and determine this question as between the party of the first part and the Fleet Corporation, it is agreed that the Fleet Corporation shall retain said funds that have been repaid on account of said unclaimed wages and shall hold the party of the first part harmless against claims of employees for unpaid wages which have been returned to the Fleet Corporation as aforesaid

### FIFTH

The party of the second part shall execute and deliver to the party of the first part such instruments, releases, or other documents as are necessary to effectually release. the mortgage amounting to $1,300,000 given by the G. M. Standifer Construction Corporation, dated October 18, 1918, to the United States Shipping Board Emergency Fleet Corporation.

### SIXTH

The party of the second part hereby agrees to endorse without recourse and deliver to the G. M. Standifer Construction Corporation the bond amounting to $350,000, dated July 1, 1918, given by the Vancouver Home Company to the G. M. Standifer Construction Corporation, and later assigned to the Fleet Corporation, and the Fleet Corporation further agrees to reassign to the G. M. Standifer Construction Corporation the mortgage amounting to $350,000 given July 1, 1918, by the Vancouver Home Company to the G. M. Standifer Construction Corporation, which mortgage was heretofore assigned to the Fleet Corporation by the party of the first part, and the party of the second part further agrees upon the execution of this contract to reassign and deliver to the party of the first part the stock of the Vancouver Home Company now being held by the Emergency Fleet Corporation as security for the loan secured by the mortgage of the Vancouver Home Company dated July 1, 1918.

### SEVENTH

The party of the second part further agrees to reassign and deliver to the party of the first part the leases on the yards of the party of the first part which have heretofore been assigned and delivered to the Fleet Corporation

### EIGHTH

The party of the first part hereby agrees to indemnify and protect the United States of America, the United States Shipping Board, and the United States Shipping Board, Emergency Fleet Corporation in its individual capacity and in its capacity as representative and agent of the United States against any and all claims, actions, or suits of any character whatsoever of the Vancouver Home Company.

NINTH

The party of the first part, for itself and its successors and assigns, does hereby remise, release and forever discharge the United States of America, the United States Shipping Board, and the United States Shipping Board Emergency Fleet Corporation and their respective successors and assigns, jointly and severally, of and from all action and actions, cause and causes of action, suits, debts, dues, sums of money, bonds, covenants, contracts, agreements. damages, claims and demands, in law, and in equity, and in admiralty, of every sort, kind and description whatsoever, arising or growing out of, or in any way connected with, the previous dealings and relations of the parties hereto, which against the said party it ever had, now has, or which its successors or assigns, or any of them, hereafter can, shall or may have, from the beginning of time up to the date of these presents, except as hereinbefore in this contract specifically provided.

TENTH

The party of the second part, for itself and its successors, does hereby remise, release and forever discharge the party of the first part, its successors and assigns of and from all action and actions, cause and causes of action, suits, debts, dues, sums of money, bonds, covenants, contracts, agreements, damages, claims and demands, in law, and in equity, and in admiralty, of every sort, kind and description whatsoever, arising or growing out of, or in any way connected with, the previous dealings and relations of the parties hereto, which against the said party it ever had, now has, or which its successors or assigns, or any of them hereafter can, shall or may have, from the beginning of time up to the date of these presents, except as hereinbefore in this contract specifically provided, and for taxes.

In witness whereof the parties hereunto have executed this agreement by causing the same to be signed respectively by an officer of the said party of the first part and by an officer of the said Fleet Corporation, acting for the said party of the second part as aforesaid, and by causing the corporate seals of the said party of the first part and of the said Fleet Corporation to be hereunto affixed, duly attested, on the day and year first above written.

Pursuant to such agreement, the Fleet Corporation paid to the Standifer Corporation $998,416.23. The pertinent part of the voucher upon which the payment was made reads as follows:

Debtor to G. M. Standifer Construction Corp.
Portland, Oregon.
July 15, 1922.
Contract Nos. 3–WC, 156–SC,
176–WC, 503–SC, 508–WH, 509–WC

In full and final settlement of all claims under and in connection with the above contracts, under settlement approved by resolution of the U. S. Shipping Board, dated July 12, 1922_____ $998,416.23

During the negotiations on July 15, 1922, leading up to the aforesaid final settlement, no specific mention was made of contractual amortization or reimbursement of the cost of plant facilities.

29. Included in the Benson award, specifically as a part of the cost of the Home Company's housing, and in principle as a part of the cost of the ships delivered to the Fleet Corporation and as an element

of damages for suspended and canceled contracts, were the following items of depreciation and/or amortization of plant facilities:

| | |
|---|---:|
| Vancouver Wood Shipyard | $272, 771. 85 |
| North Portland Wood Shipyard | 32, 396. 96 |
| Vancouver Steel Shipyard | 369, 555. 19 |
| Vancouver Home Company Housing | 187, 500. 00 |
| | 862, 224. 00 |

All of these items of depreciation and/or amortization of housing and plant facilities were upon housing and plant facilities constructed, erected, acquired or installed subsequent to April 6, 1917, except the item of $32,396.96. Of this last item, part was on plant constructed prior to and part on plant constructed after April 6, 1917.

30. The claim for amortization of the plant and housing facilities for 1918, 1919, and 1920, for the first time was made and attached to the consolidated tentative return of the Standifer Corporation and the Home Company for the year 1921, on March 11, 1922. A like claim was filed with the final return of 1921 some time in May, 1922.

31. The Commissioner treated the amount paid in the settlement as a compromise of the Benson award, and each item in it, proportionately. The maximum amount that could be paid under the Benson award was $2,791,725.07. The amount or credits received by the taxpayer since the award was $1,685,916.25. The following table shows the method by which the Commissioner arrived at the compromise amounts of " contractual amortization," upon his theory that the settlement was in part for reimbursement of the cost of certain facilities:

| | | |
|---|---:|---:|
| Maximum amount due contractor under " Benson Award " | | $2, 791, 725. 07 |
| *Received by Contractor:* | | |
| Cash received by contractor in final settlement July 15, 1922 | $998, 416. 25 | |
| Cash payment on account June 8, 1921 | 500, 000. 00 | |
| Credit on account of Housing Project | 187, 500. 00 | |
| | | 1, 685, 916. 25 |
| Basis of compromise _____ $1, 685, 916. 25– | 0. 60389 | |
| $2, 791, 725. 07 | | |

*Contractual Amortization Allowances:*

| | |
|---|---:|
| Vancouver Wood Shipyard | $272, 771. 85 |
| North Portland Wood Shipyard | 32, 396. 96 |
| Vancouver Steel Shipyard | 369, 555. 19 |
| Total for shipyards | $674, 724. 00 |
| Vancouver Housing Project by credit applying on mortgage | 187, 500. 00 |
| Total contractual amortization | $862, 224. 00 |

The compromised amounts used in the final determination of the Commissioner are as follows:

Vancouver Wood Shipyard_____ $272, 771. 86 × 0. 60389__ $164, 724. 19
North Portland Wood Shipyard_____ 32, 396. 96 × 0. 60389__ 20, 564. 20
Vancouver Steel Shipyard_____ 369, 555. 19 × 0. 60389__ [1]223, 170. 68

   Total compromised amount allowed on the three shipyards_ [2]408, 459. 07

The amount of $187,500 allowed by the Shipping Board in the final settlement with the taxpayer as a credit against the balance due on the $350,000 mortgage on the property of the Vancouver Home Co. was not treated by the Commissioner as contractual amortization for tax purposes but was taxed as income in the year 1922, the year in which it was received.

32. The taxpayer claims a total amortization deduction of $2,671,220.12, made up as follows:

Allowed by Commissioner_____ $1, 963, 887. 93
"Contractual Amortization" deducted by Commissioner_____ 399, 911. 64
Amortization on house facilities_____ 307, 420. 55

   Total_____ 2, 671, 220. 12

### OPINION.

TRAMMELL: The following questions are presented for decision:

1. Were the Home Company and the Standifer Corporation affiliated during the years involved?

2. Whether a claim for amortization filed by the Standifer Corporation is a sufficient compliance with the statute when the deduction is claimed on account of facilities acquired by the Home Company, another corporation, which was included in a consolidated return with the Standifer Corporation.

3. Whether the buildings constructed by the Home Company were facilities acquired for the prosecution of the war, within the meaning of section 234 (a) (8) of the Revenue Acts of 1918 and 1921.

4. Whether the amortization deduction, if any, in so far as it relates to housing facilities acquired by the Home Company, should be allowed only to that company in determining its net income, or should be allowed to the consolidated group in determining the net income of the consolidated group, if the two corporations were affiliated.

5. How the amount of the amortization deduction allowable to each of the corporations should be spread over the different taxable periods within the amortization period.

---

[1] Adjusted to $214,623.25.   [2] Adjusted to $399,911.64.

6. Whether, in computing the war-profits tax for 1920, the taxpayer is entitled to deduct from the war profits the amortization deduction to which it is entitled in that year.

7. Whether any portion of the amount received from the Fleet Corporation in settlement of claims of the taxpayer should be considered as a reimbursement of cost of facilities and be applied to reduce the basis on which the amortization deduction is determined.

8. Whether the Standifer Corporation is entitled to have its profits tax computed under the provisions of section 328 of the Revenue Act of 1918.

These questions will be discussed in the order stated.

Section 240 (b) of the Revenue Act of 1918 provides as follows:

(b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same-interests.

Section 240 (a), however, contains the following proviso:

That there shall be taken out of such consolidated net income and invested capital, the net income and invested capital of any such affiliated corporation organized after August 1, 1914, and not successor to a then existing business, 50 per centum or more of whose gross income consists of gains, profits, commissions, or other income, derived from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive. In such case the corporation so taken out shall be separately assessed on the basis of its own invested capital and net income and the remainder of such affiliated group shall be assessed on the basis of the remaining consolidated invested capital and net income.

In the stipulation of facts it is stated that the Standifer Corporation owned all of the stock of the Home Company. The Standifer Corporation, however, was organized after August 1, 1914, and 50 per cent or more of its gross income consisted of gains, profits, commissions, and other income derived from Government contracts made between April 6, 1917, and November 11, 1918, and, under the express language of the proviso quoted above, must be excluded from a consolidated return with any other corporation unless it was the successor to a business which was in existence on August 1, 1914.

1. The only question, therefore, with respect to the affiliation of these two corporations, is whether the Standifer Corporation did in fact succeed to a business which was in existence on August 1, 1914, it being conceded that the other requirements of the statute are fully met.

G. M. Standifer and J. F. Clarkson formed a partnership in 1913 which was known as the Standifer-Clarkson Co. This partnership was in existence on August 1, 1914. In 1916 the Standifer-Clarkson Shipyards, Inc., succeeded the partnership, and in 1917 it was in

turn succeeded by the Standifer Corporation.  In each of the organizations all of the property of every nature and kind, as well as the business, was acquired by the successor.  It is conceded by the Commissioner in his brief that the Standifer Corporation was the successor of the former corporation known as the Standifer-Clarkson Shipyards, Inc., which was the successor of the partnerships, including the one formed in 1913 known as the Standifer-Clarkson Co.  It is contended, however, by the Commissioner that the partnership of the Standifer-Clarkson Co., which was in existence prior to August 1, 1914, was not engaged on that date in the business of building ships and that the business of the Standifer Corporation was that of shipbuilder exclusively and for this reason it can not be held that the Standifer Corporation was the successor of a business which was in existence on August 1, 1914.

The business of the predecessor corporations and partnerships to which the Standifer Corporation succeeded was that of constructing and contracting.  The Standifer Corporation was also engaged in the contracting and construction business.  The fact that the Standifer Corporation devoted its attention exclusively to constructing ships for the Government is not, in our opinion, a sufficient departure from the business carried on by the predecessor partnership on August 1, 1914, to bring the corporation within the scope of the proviso contained in section 240, above quoted.

It is a rule of statutory construction long adhered to that provisos and exceptions in a statute must be strictly construed and that the general provisions of a statute are applicable unless it is established that a person or corporation comes well within the words as well as the reason of the exception or proviso.  This principle was announced by the United States Supreme Court in the case of *United States* v. *Dickson*, 15 Pet. 141, and has never been departed from by that court.   See *Bank of Commerce* v. *Tennessee*, 161 U. S. 134; *Perry Co.* v. *Norfolk*, 220 U. S. 472.

When we consider the conditions and circumstances existing at the time of the enactment of the Revenue Act of 1918, we are convinced that the corporations in this case do not come within either the language or spirit of the proviso.

It seems to us to be clear that the Standifer Corporation succeeded to the business of the predecessor corporation which itself succeeded to the business of the partnership which was in existence on August 1, 1914.  It is true, as contended by the Commissioner, that the word " business " has many meanings.  We do not believe, however, that it is limited to the particular kind of activities engaged in by its predecessor organizations.  The contracting business may assume many phases of activity.  Before the war the predecessors of the

taxpayer were constructing railroads, office buildings and other structures. The necessities of the war forced the abandonment of such projects and the devotion of all energy to war projects, but, although the character of the product changed, the business was the same.

It follows from the foregoing that, in our opinion, the Standifer Corporation and the Home Company were affiliated during the years involved.

2. The second question presented is whether a claim for amortization, which is required to be filed by statute in order to entitle a taxpayer to the deduction, was properly filed in this case. Any question as to whether the claim was filed within the time required by the statute has been answered by section 1209 of the Revenue Act of 1926, which was approved after this case was heard by the Board. Under the above section, the amortization deduction allowed by section 234 (a) (8) of the Revenue Act of 1918 may be allowed for the taxable years 1918, 1919 and 1920, if claim therefor was made before June 15, 1924. The claim in this case was filed prior to that date. This, however, does not fully answer the question. In so far as the deduction which is claimed on account of the housing facilities acquired by the Home Company is concerned, another question is presented. The amortization claimed with respect to such facilities was filed by the Standifer Corporation and not by the Home Company. As to whether one corporation in a consolidated group may file a claim for amortization on account of facilities constructed by another corporation within the group, within the meaning of section 1209 of the Revenue Act of 1926, depends upon the theory of the consolidated return. Where corporations are affiliated and a consolidated return is required, only one return is required to be filed. In that return the net income and the invested capital of all the corporations included in the group are reported. That return is, under the statute, the return of each of the separate companies, and, in our opinion, the filing of an amortization claim by the principal corporation on account of the amortization deduction due to a subsidiary corporation is a sufficient compliance with the statute. A subsidiary corporation which was entitled to a deduction on account of amortization, whose net income and invested capital were included in a return filed by another affiliated corporation, could not literally file a claim for amortization with its return because as such it filed no return. Section 1209 above referred to merely provides that claim shall be made for the amortization, and, considering the theory of the consolidated return, we do not believe that it was the intention of Congress to require each separate affiliated corporation to file such a claim when it was filed by the parent or principal company when the

consolidated return was filed, or if the claim was filed by the parent or principal company within the statutory period.

3. The third question presented is whether the buildings constructed by the Home Company were facilities acquired for the·prosecution of the war within the meaning of the amortization section. If the buildings in question had been erected by the Standifer Corporation, which company was actually engaged in building ships for the transportation of articles and men contributing to the prosecution of the war, it seems to us that there could be no question but that such buildings would be considered to be facilities constructed or acquired for the production of articles contributing to the prosecution of the war within.the meaning of the statute. Under the conditions existing at the time when the contracts for the building of the vessels were entered into by the Standifer Corporation, the vessels could not have been constructed on account of labor conditions unless facilities were acquired for the housing of the men. Under the circumstances, the housing of the men was just as essential as the buildings for other purposes and as necessary as the shipways. It was so recognized by the taxpayer and the Fleet Corporation. That the housing facilities were necessary for carrying on the work of shipbuilding does not seem to be denied by the Commissioner, but it is contended that such facilities were not acquired by a corporation which was engaged in producing articles contributing to the prosecution of the war or in building ships for the transportation of men and materials. On the other hand, it is contended that the Home Company, which erected such houses, merely leased them to employees of the shipbuilding company and that its business was renting or leasing houses and not carrying on such work as was contemplated by the amortization section.

We held, in the *Appeal of Moore Investment Co.*, 2 B. T. A. 579, that, where one company merely leased a building to another company which was engaged in building ships or producing articles contributing to the prosecution of the war, the company which leased the houses to such building company could not be held to have acquired facilities for the production of articles contributing to the prosecution of the war. We also held there that the benefits of the amortization section were limited to those concerns which manufactured or produced articles contributing to the prosecution of the war. The facts in this case are materially different from those in the *Appeal of Moore Investment Co.* Here the company which constructed the houses was simply a part of a business unit which was engaged in the shipbuilding business. It did not acquire the buildings as an investment proposition, but for the purpose of contribut-

·ing to the prosecution of the war. It could not have used the buildings for any other purpose under the operating agreement with the Fleet Corporation and the Standifer Corporation. In a consolidated group each of the separate corporations is a part of a single unit of a business enterprise. These companies may be compared to the different departments in a department store. The Standifer Corporation, which was engaged in building the ships, in order to carry on its business, required houses for its employees. It could not erect them itself on account of the requirements of the Fleet Corporation, and the Home Company was organized to erect such houses merely to comply with requirements of the Fleet Corporation. They were acquired by that company, not for any purposes of its own, but to enable the shipbuilding company to build ships for the Government. We think such a situation is entirely different from a case where an entirely separate company builds houses for the purpose of leasing them to another company. For this reason we are of the opinion that the facilities erected or acquired by the Home Company were facilities acquired or constructed for production of articles contributing to the prosecution of the war within the meaning of the amortization section, and that a reasonable deduction on account of the amortization of such facilities should be allowed.

4. The fourth question presented is whether the amortization deduction, in so far as it relates to the housing facilities of the Home Company, should be allowed only to that company in determining its net income, or should be allowed the consolidated group or to the Standifer Corporation.

It was contended by both the Commissioner and the taxpayer that the solution of this question rests upon the nature of the consolidated return. The question thus presented is whether, in a consolidated group of corporations, the separate entities are obliterated, or whether the deductions allowed each company are to be deducted from the gross income of each company in arriving at its net income, or, in other words, whether it is the net income and invested capital of each of the companies which are to be included in a consolidated return, or whether it is the income and invested capital of the entire group determined as one business in which the separate entities included therein are fused.

In the *Appeal of American La Dentelle, Inc.*, 1 B. T. A. 575, we said:

From July 1, 1919, however, Congress has said that the generally recognized principle of corporate identity was to be overridden for the purpose of the income and profits tax and that a consolidated return should be filed "if substantially all the stock of two or more corporations is owned or controlled by the same interests," which is the situation here. From July 1, in other words, the separate existences ceased for tax purposes just as effectually as

if under a State statute the corporations had been consolidated for all corporate purposes. A new tax status was created.

See also *Appeal of Frank G. Shattuck Co.*, 2 B. T. A. 7.

The language above quoted sets forth our view with respect to the nature and effect of a consolidated return. It must follow that the amortization deduction is a deduction allowable to the affiliated group of corporations in a consolidated return. This means, under the circumstances of this case, that the amortization deduction with respect to the housing facilities erected, constructed or acquired by the Home Company should be allowed as a deduction in determining the net income to be included in the consolidated return, irrespective of whether in arriving at such consolidated net income the deduction is in the first instance applied to or by the Home Company.

5. It was stipulated that the amortization period extends from January 1, 1918, to February 12, 1920. During the year 1918 the affiliated group of corporations had no net income, but, on the other hand, had a large loss in that year. It had a large net income in 1919 and in the period from January 1, 1920, to February 12, 1920. The question then arises as to how the amortization deduction should be spread or allocated to the different taxable years within the amortization period, that is, whether it should be spread on the basis of net income or upon the basis of gross sales, or some other basis.

Since there was no income during the taxable year 1918, the Commissioner contends that a reasonable allowance on account of amortization of war facilities should be prorated or spread in accordance with the gross sales, as otherwise there would be no deduction in 1918 and the entire deduction would be spread over the period between the year 1919 and the fiscal period ending February 12, 1920.

The taxpayer, on the other hand, contends that such method of spreading or allocating the deduction allowed would be inequitable and would not permit the full benefit of the deductions to which the affiliated group is entitled; that, since it did not have any income in 1918, a deduction allowed to it in that year on account of the amortization of war facilities would mean nothing and would be of no advantage whatever, and for this reason a reasonable deduction in each of the years would be arrived at by spreading the total amount allowable over the different periods in accordance with the net income during each of the periods.

The statute makes no provision with respect to the method of allocating or spreading the deduction allowed over the different taxable years or periods within the amortization period, but merely provides for a reasonable deduction in determining the net income subject to tax. After the enactment of the Revenue Act of 1918, the Commis-

sioner, with the approval of the Secretary, promulgated article 185 of Regulations 45, which, in part, is as follows:

Amortization period.—The amortization allowance shall be spread in proportion to the net income (computed without benefit of the amortization allowance) between January 1, 1918 (or if the property was acquired subsequent to that date, January 1st of the year in which acquired) and either of the following dates:

(a) If the claim is based on (1) of article 184, the date when the property was or will be sold or permanently discarded as a war facility; or (b) if the claim is based on (2) of article 184, the actual or estimated date of cessation of operation as a war facility.

The situation with which Congress was confronted when the amortization provision was being considered was an extraordinary one. This provision is admittedly a relief measure. This fact should be kept in mind in interpreting the provision. Relief provisions are to be given a liberal construction. With respect to the construction of remedial statutes, Lewis' Sutherland Statutory Construction, section 583, states as follows:

Remedial statutes to be liberally construed—What are remedial statutes.— In the modern sense remedial statutes not only include those which so remedy defects in the common law, but defects in our civil jurisprudence generally, embracing not only the common law, but also the statutory law. They are in a general sense remedial whether they correct defects in the declaratory, directory or remedial parts, as the author just quoted has defined them. There are also the three points mentioned by the author to be considered in the construction of all remedial statutes—the old law, the mischief, and the remedy; that is, how the law stood at the making of the act; the mischief for which that law did not adequately provide, and what remedy the legislature has supplied to cure this mischief. And it is the duty of judges so to construe the act as to suppress the mischief and advance the remedy.

Under the law as it would have stood without the benefit of the amortization section, taxpayers who were required on account of war conditions to acquire or construct facilities at the extraordinary high prices then prevailing for the purpose of producing articles contributing to the prosecution of the war would have been required to capitalize such facilities and would not have had the benefit of any deduction on that account, excepting a deduction on account of the exhaustion, wear and tear of such facilities in use. It was clearly the purpose of Congress to afford relief to such taxpayers by permitting them to take a reasonable deduction on account of such facilities. The language used in the amortization section is general in its nature and does not specifically provide how this deduction may be taken where it must be spread over more than one taxable year.

In order that taxpayers may have the full benefit of such a deduction and obtain a full measure of relief, it seems to us that the deduction should be allocated in accordance with the amount of the net income during the different periods before taking into considera-

tion the amortization allowance. When relief is given by statute to a taxpayer by means of a deduction, that relief can be more adequately given by determining the amount of the deduction in each of the years in accordance with the income; otherwise, as in this case, a taxpayer may be required to expend large sums of money during a taxable year and, on account of the changes in its business conditions and other circumstances, may have no net income from which it can take a deduction or get the benefit which was intended to be given.

The contention of the Commissioner that the deduction should be spread in accordance with the use to which the facilities were put, as determined by the gross sales during each of the years, is not persuasive. The use to which facilities are put by a taxpayer during the amortization period as compared to the use to which they are put in the postwar period may be taken into consideration in determining the gross amount of the amortization deduction which is to be spread over the different taxable years, but it seems to us that it has no place in determining the amount of deduction to be taken in each of the years within the amortization period.

In our opinion, article 185 of Regulations 45, promulgated by the Commissioner, with the approval of the Secretary, interpreting the amortization section contained in the Revenue Act of 1918, is a fair and reasonable interpretation of that section. The amortization deduction should therefore be spread over the years within the amortization period in accordance with the net income before taking into consideration the amortization allowance.

6. The next question presented is whether, in computing the war-profits tax for 1920, the corporations are entitled to deduct against the income from Government contracts the amortization deduction to which they are entitled in that year.

In determining the amount of the net income from Government contracts in 1920, the Commissioner has allowed as a deduction against the net income from such contracts, determined before taking amortization, 35.78 per cent of the amount allocated to such year for the amortization deduction. The remaining 64.22 per cent of the amortization deduction has been applied and allowed against the net income from peace-time work. Section 301 (c) of the Revenue Act of 1918 provides as follows:

For the taxable year 1919 and each taxable year thereafter there shall be levied, collected, and paid upon the net income of every corporation which derives in such year a net income of more than $10,000 from any Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive, a tax equal to the sum of the following:

(1) Such a portion of a tax computed at the rates specified in subdivision (a) as the part of the net income attributable to such Government contract or contracts bears to the entire net income. In computing such tax the excess-

profits credit and the war-profits credit applicable to the taxable year shall be used;

(2) Such a portion of a tax computed at the rates specified in subdivision (b) as the part of the net income not attributable to such Government contract or contracts bears to the entire net income.

For the purpose of determining the part of the net income attributable to such Government contract or contracts, the proper apportionment and allocation of the deductions with respect to gross income derived from such Government contract or contracts and from other sources, respectively, shall be determined under rules and regulations prescribed by the Commissioner with the approval of the Secretary.

Congress anticipated that there would be taxpayers who would derive income from Government contracts in years subsequent to 1918. It was its desire to impose the high profits tax prescribed for 1918 on the income derived in such subsequent years from such contracts. That is why the above-quoted section was placed in the statute. Congress also realized that, by separating the income of a particular year into two classes and imposing a much higher rate of tax on one class than on the other, it would also be necessary to make a similar separation or division of the expenses of the year, so that the purpose of the provision would not be defeated by allowing the deduction of the expenses incurred in earning the income from one source against the income from another source.

The regulation promulgated by the Commissioner for the administration of this section of the statute is article 715 of Regulations 45, which reads:

Whenever it is necessary to determine the portion of the net income derived from or attributable to a particular source, the corporation shall allocate to the gross income derived from such source, and to the gross income derived from each other source, the expenses, losses, and other deductions properly appertaining thereto, and shall apply any general expenses, losses, and deductions (which can not properly be otherwise apportioned) ratably to the gross income from all sources. The gross income derived from a particular source, less the deductions properly appertaining thereto and less its proportion of any general deductions, shall be the net income derived from such source. The corporation shall submit with its return, a statement fully explaining the manner in which such expenses, losses, and deductions were allocated or distributed.

The cost of the war facilities for which the amortization deduction is allowed relates or appertains only to the income from Government contracts, and such war-cost deduction has no relation whatever to the peace-time income from which a deduction for depreciation on such war facilities is allowed. The effect of the Commissioner's action is to allow 64.22 per cent of the amortization deduction against peace-time profits upon which the rates of tax are much lower than on income from Government contracts, and accordingly not to permit the taxpayer to recover out of its war income its extraordi-

nary war costs, but, on the other hand, to make a portion of such costs recoverable out of peace-time profits. The result reached by the Commissioner is, in our opinion, contrary to the intent of the statute. The deduction should be allowed against income from war contracts.

7. The next question for consideration is whether any portion of the amount received from the Fleet Corporation in settlement of claims of the Standifer Corporation should be considered as a reimbursement of cost of facilities and be applied to reduce the basis on which the amortization deduction is determined.

The Revenue Act of 1918, in so far as it is pertinent to the discussion of this question, provides as follows:

Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*      \*      \*      \*      \*      \*      \*

(8) In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortization of *such part of the cost* of such facilities or vessels *as has been borne by the taxpayer*, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income. \* \* \* (Italics ours).

When the amortization provision of the statute, as contained in the foregoing section, was being discussed on the floor of the House of Representatives, an amendment was offered by Representative Anderson of Minnesota, in the following language:

*Provided,* That whenever the contract for the production of war material or articles contributory to the prosecution of the war or additional plant extensions or facilities necessary therefor, makes provision or allowance for the amortization of plant extensions or facilities or for the depreciated value of the same, either before or upon the expiration of the contract, no allowance or deduction shall be made under this paragraph.

Representative Green, a member of the Committee on Ways and Means in charge of the bill in the course of its passage, in discussing this amendment, said:

Of course the gentleman has examined the provisions at the top of page 15 where it provides that there may be allowed a reasonable deduction for the amortization of such part of the cost of such facilities as has been borne by the taxpayer. The Committee thought, or at least I thought, that that would cover just such cases as the gentleman mentioned.

Mr. Green further said:

The amendment of the gentleman from Minnesota, as I view it, is entirely unnecessary. The provisions of the paragraph go even further than his own amendment in providing that where the loss is not borne by the taxpayer there

## 4 U. S. BOARD OF TAX APPEALS REPORTS.     (525)

shall be no amortization. For that reason I can see no necessity for his amendment.

The amendment was rejected, and it seems a fair assumption to say that it was rejected because the purpose sought to be attained thereby was already embodied in the section, as contended for by Mr. Green. Only the cost of facilities borne by the taxpayer is subject to the amortization deduction.

Whether the Government contracts under which a taxpayer produced articles contributing to the prosecution of the war specifically provided for amortization as such or, in other words, provided that the Government would pay the cost, or any part thereof, of the facilities acquired or constructed by a taxpayer in order to carry out the contracts, seems to us to be not controlling. The real question is: Did the Government actually pay or bear the expense of any part of the cost of such facilities? If it did, such part of the cost borne by the Government must be subtracted from the cost of facilities acquired by the taxpayer upon which the amortization deduction is allowed. There is no deduction allowed to a taxpayer with respect to such part of the cost of facilities which was not borne by him. Whether such cost of facilities was actually borne by the Government originally when the facilities were acquired, or whether it was borne by the Government subsequently when the settlements of the contracts were made between the Government and the taxpayer, is immaterial. We believe that the contention of the Government in this regard, as a matter of law, is well founded, but whether such principle is applicable to the facts in this case presents more difficulty.

We find nothing in the contracts entered into by the taxpayer and the Fleet Corporation which would indicate that the Government intended, at the time of entering into the contracts, to bear any part of the cost of facilities acquired for carrying them out. The taxpayer, however, filed claims aggregating an amount in excess of $11,000,000, and included therein amounts which represented reimbursement in part for the cost of their shipyard and housing facilities. These claims were considered by the Fleet Corporation and recognition was made in part of the validity of such claims, and an award was made by the Fleet Corporation accepting this principle as well as setting a limitation within which the entire claim was to be allowed subject to audit. This was known as the Benson award. The Benson award, however, was not the basis of the final settlement. The Fleet Corporation considered that it was not bound by that award and further negotiations were entered into by the taxpayer with the Fleet Corporation for the purpose of reaching a settlement of these claims. From 1920 to July 15, 1922, the taxpayer and the Fleet Corporation had many conferences with respect

to these claims. All of the negotiations and conflict between the taxpayer and the Fleet Corporation ended suddenly on July 15, 1922. The chairman and the general counsel of the Shipping Board disregarded all past negotiations and the Benson award and agreed to settle for $1,000,000. On July 15, 1922, Standifer, the president of the Standifer Corporation, was in the office of the Fleet Corporation in conference with Schlesinger, the general counsel. At that time Schlesinger stated: " While I believe that we can beat you in court it will be only at great expense to the Government and to you and may be after a great many years." He further said: " In other words, you have a nuisance value which amounts to a considerable sum of money." He further said: " I will agree to pay you a little something to get rid of you on that ground. I am tired of seeing you around the place here." Standifer said: " Would you mind estimating to me what my nuisance value is, Mr. Schlesinger?" Schlesinger replied: " How would a million dollars strike you?" Standifer said: " Is that an offer?" whereupon Schlesinger replied that it was. Standifer then said: " If you will give me a check right immediately I will accept it." ·

In order not to make the settlement in round numbers of a million dollars, it was agreed to accept a check for $998,416.23. The voucher accompanying the check was as follows:

(For Purchases and Services other than Personal)

G. M. Standifer Construction Corp.     July 15, 1922.
Portland, Oregon.     E. F. C.  Order  or  Contract  No.
3–WC:          156 SC,
176–WC:        503–SC: 508–WH:
and            509–WC.

| Article or Service | Amount | |
|---|---|---|
| In full and final settlement of all claims under and in connection with the above contracts, under settlement approved by resolution of the U. S. Shipping Board, dated July 12, 1922 | Pay Voucher No. | CLAIMS 69 |

$998, 416. 23

This voucher does not mention amortization or depreciation of plant, nor reimbursement of any part of the cost of facilities, but refers to six contracts, none of which were on a cost-plus basis. The settlement agreement sets forth the basis of the settlement as follows:

1. Payment to taxpayer of $998,416.23.
2. Settlement of Commitments, including Ballin Royalties.
3. Assumption of Pacific Marine Iron Works liability by taxpayer.
4. Unclaimed wages were taken over by Fleet Corporation.
5. $1,300,00 mortgage was released by Fleet Corporation.

6. $350,000 bond and mortgage of the Home Company were reassigned to the Standifer Corporation.

7. Leases were reassigned to the Standifer Corporation.

8. The Standifer Corporation agreed to indemnify the Fleet Corporation against claims of the Home Company.

9. General release by taxpayer.

10. General release by Fleet Corporation.

It does not necesarily follow that, because the Standifer Corporation made a claim for reimbursement of a part of the cost of facilities, any part of such claim was allowed in the final lump sum settlement. The taxpayer filed claims exceeding $11,000,000. Included therein were damages for breach of contract, settlement for facilities, and various other claims. The allowance by the Fleet Corporation of a small proportion of the claims does not necessarily mean that a portion of each of the claims was allowed as contended for by the Commissioner. The Benson award was not followed or recognized in the final settlement, which was independent of all other proposed settlements.

From a consideration of all the evidence, we are of the opinion that no part of the cost of the facilities on which amortization is allowable can be considered to have been borne by the Government, and that the taxpayer is entitled to the deduction for amortization without reduction of the cost of facilities by any part of the amount of the settlement with the Fleet Corporation.

8. The next question is whether the profits tax for each of the years should be computed under sections 327 and 328 of the Revenue Acts of 1918 and 1921.

It is contended by counsel for the taxpayer that the taxpayer comes within the provisions of section 327 (d) of the respective Acts and for that reason is entitled to assessment under the provisions of section 328.

Section 327, in so far as it is pertinent, is as follows:

That in the following cases the tax shall be determined as provided in section 328:

\*        \*        \*        \*        \*        \*        \*

(d) Where upon application by the corporation the Commissioner finds and so declares of record that the tax if determined without benefit of this section would, owing to abnormal conditions affecting the capital or income of the corporation, work upon the corporation an exceptional hardship evidenced by gross disproportion between the tax computed without benefit of this section and the tax computed by reference to the representative corporations specified in section 328. This subdivision shall not apply to any case (1) in which the tax (computed without benefit of this section) is high merely because the corporation earned within the taxable year a high rate of profit upon a normal invested capital, nor (2) in which 50 per centum or more of the gross income of the corporation for the taxable year (computed under section 233 of Title II) consists of gains, profits, commissions, or other income, derived on a cost-

plus basis from a Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive.

This section of the statute is admittedly relief legislation and should be liberally construed in accordance with the well-accepted rule of statutory construction with respect to such legislation.

We will now consider whether, under the facts of this case, the taxpayer had abnormalities in income or invested capital of a nature and character sufficient to entitle it to have its profits tax determined by comparison with the taxes paid by other concerns.

In the year 1919 the taxpayer did a gross business of $24,524,066.70 on a statutory invested capital of $20,917.22. In 1920 its gross sales amounted to $15,654,538.09 on a statutory invested capital of $20,916.66. Its business for 1921 was $4,623,766.98 with no statutory invested capital.

The taxpayer borrowed money from the Government and others during the taxable years in the following amounts:

|  | Total borrowed money. | From Government. | Other sources. |
|---|---|---|---|
| January 1, 1919 | $7,311,102.87 | $1,650,000.00 | $5,661,102.87 |
| December 31, 1919 | 3,398,902.43 | 1,643,958.13 | 1,754,944.30 |
| December 31, 1920 | 2,139,354.78 | 1,627,838.07 | 511,516.71 |
| December 31, 1921 | 2,219,482.94 | 1,627,482.94 | 592,000.00 |

The loans made to the corporation by the Government were secured by the personal guarantees of Menefee, Jones and Standifer, the principal stockholders of the Standifer Corporation. These three men also were required to execute guarantees for the performance of the contracts entered into with the Fleet Corporation for the construction of ships, and with respect to one contract with the Government for the construction of ships they were required to execute a bond as security of the Standifer Corporation for $1,300,000 guaranteeing the performance of the contract.

Section 327 of the respective Revenue Acts does not specifically provide that the use of borrowed money in carrying on business creates an abnormality of capital or affects income abnormally. Whether it does or not is a question of fact to be determined in each case. It is not necessarily true that such a situation creates an abnormality. We think, however, that where capital is a material income-producing factor, but where, because of the fact that the capital employed is in a large part borrowed, there is no invested capital or the invested capital is materially disproportionate to the net income as compared with representative corporations engaged in a like or similar trade or business, an abnormality of invested capital is produced which is clearly contemplated by section 327.

50144°—27——39

As originally introduced in the House, section 327 contained such a provision in the following language:

Where capital is a material income-producing factor, but where, because of the fact that the capital employed is in a large part borrowed, there is no invested capital or the invested capital is materially disproportionate to the net income as compared with representative corporations engaged in a like or similar trade or business.

When the bill reached the Senate it was fully discussed and other provisions were added, but this provision, which was contained in the House bill as originally introduced, remained and it was contained in the bill as it passed the Senate. After the bill passed the Senate it was referred to the Conference Committee. Mr. Kitchen, who was a member of the Conference Committee and had charge of the bill in the House, in his report from the committee to the House, said, with respect to this section:

The House bill in the so-called relief provisions provided that in certain specified cases the invested capital of a corporation shall be the amount which bears the same ratio to the net income of the corporation for the taxable year as the average invested capital for the taxable year of representative corporations engaged in a like or similar trade or business bears to their average net income for such year.

The Senate amendment increases the class of cases in which the tax is to be fixed by reference to the experience of representative corporations; included therein all foreign corporations, and provides that in such cases the tax shall be the amount which bears the same ratio to the net income of the taxpayer for the taxable year as the average tax of representative corporations engaged in a like or similar trade or business bears to their net income for such years.

The House recedes with amendments:

(1) Making clerical changes;

(2) Consolidating a number of separate classes of cases differentiated in the Senate Amendment into a single class of cases in which upon application by the corporation * * *.

From a consideration of the legislative history of sections 327 and 328, we believe that, where the capital used by a taxpayer was in a large part borrowed, an abnormality of invested capital may be created within the meaning of section 327. In this case the borrowed money, which was an income-producing factor in the business, was many times the amount of the capital invested. In fact, the capital invested was insignificant in comparison with the capital borrowed. The business done and the net income of the taxpayer are materially disproportionate to the capital which was invested in the enterprise.

For the foregoing reasons, we are of the opinion that the taxpayer is entitled to have its profits taxes compared with the taxes paid by comparative corporations to be selected by the Commissioner and the tax computed upon the basis of such comparison if any relief

is thereby granted. The determination of the tax on this basis will be considered as final. *Appeal of The Viscose Co.*, 3 B. T. A. 444.

*Judgment for the petitioners.*

STERNHAGEN concurs in the result only.

MARQUETTE dissents on the fourth point.

ARUNDELL and MILLIKEN did not participate.